No. 39,599

Lura M. Henshie; Maud Lupton; Nellie Mayberry; Vera Simpson; Lula M. Nash; L. E. Nash; Marjorie Squires; Willis N. Nash; Donald Norris; G. H. Norris; Virginia Lee Smith; Wirt C. Salthouse; Gladys Boston; Bertha C. Haberlein and Mrs. Jonas Almgren, *Appellants*, v. The McPherson and Citizens State Bank, a Corporation, as Co-Executor of the Estate of H. L. Salthouse, deceased; S. S. Simpson, individually and as Co-Executor of the Estate of H. L. Salthouse, deceased; Rachel Simpson; Eulalia Salthouse, an insane person; and The First National Bank in Wichita, a Corporation, *Appellants*. Roger W. Lovett, Guardian *ad Litem* and Attorney under Soldiers' and Sailors' Relief Act of 1940 as amended, *Appellee*.

(280 P. 2d 937)

Opinion filed March 5, 1955.

*Charles E. Jones,* of Wichita, argued the cause, and *J. R. Rhoades,* and *George R. Lehmberg,* both of McPherson, and *Mark H. Adams, William I. Robinson, J. Ashford Manka* and *Clifford L. Malone,* all of Wichita, were with him on the briefs for the appellants.

*Evart Mills* and *Roger W. Lovett,* both of McPherson, argued the cause; *Roger W. Lovett,* of McPherson, was on the briefs for the appellee.

The opinion of the court was delivered by

SMITH, J.: This is an appeal from an order of the trial court refusing to approve the tenth annual accounting of a testamentary trust. The trustees have appealed.

It is deemed wise to set down a few uncontroverted facts at the outset.

The trust was created by the will of H. L. Salthouse. In the second paragraph he declared his will that his daughter, Eulalia, should have the benefit and income from all his property, both real and personal, for life. In the same paragraph he provided that this property should be vested in the trustees, whom he named in the will. He set out conditions as follows:

"(a) The trustees herein appointed shall have full power and authority to manage and control all of my said estate, both real and personal property, during the life of my beloved daughter, Eulalia Salthouse, and may in their discretion, have the right to invest and reinvest all of my personal property

of which I may die possessed, in safe and non-speculative securities, and shall have power and authority to sell, lease, or otherwise dispose of any and all of my real estate, except such of my real estate as is hereinafter specifically devised, and said trustees shall have authority to execute oil and gas leases upon any portion of my real estate, when in their discretion they deem it advisable, it being my desire that my trustees shall have the same power and control of my said estate, both real and personal, (except that they shall not have the power to sell real estate which I have specifically devised) as I myself would have should I be living.

"(b) *All* the rents, profits and income arising from my trust estate, after the payment of taxes and other charges, shall be collected by my trustees and shall be used for the care, support and maintenance of my daughter, Eulalia Salthouse, it being my desire that my said trustees in making expenditures for my said daughter shall in every way do all that is possible to see that she is comfortable and well cared for and that she shall have sufficient money to make all reasonable contributions to any church or benevolences as she may desire, or to her relatives as she may desire. For this purpose my trustees are authorized to use the full rent, profits and income from my trust estate and may, if necessary, use a limited portion of the principal of my said trust estate, but the principal of said trust estate shall only be used after application and order of a court of proper jurisdiction. Provided, that the rents, profits and income arising from my trust estate and the trust estate itself shall be exempt and free from the claims and demands of any and all creditors of my daughter, Eulalia Salthouse.

"(c) My trustees may decide in their discretion between themselves as to which portion of my real estate they may individually control and manage, and they may each and individually, after such decision, have the same power and control over that portion which each may decide to manage and control, to the same extent as if all of my said trustees were exercising the management and control thereof, it being my desire that this provision will facilitate the management of said real estate which is located in several different states of the Union."

Special attention is called to the words in subparagraph (2) where the testator excepted from the real estate his trustees had power to sell, that which he had specifically devised in his will. The third paragraph gave certain property in fee to S. S. Simpson and his wife on the death of Eulalia. The fourth paragraph gave to L. E. Nash and Lula M. Nash, or the survivor, upon the death of Eulalia, described property for life and at the death of the survivor to named persons, their heirs and assigns forever. This property was given to the Nashes for life with the fee title to go to other named persons at their death. This clause made special mention of the household goods then in the house and the automobile or automobiles, if any, in which the Nashes got a life estate. This, it should be noted, is the property on which testator was living with

Mr. and Mrs. Simpson at the time of his death, and which is now occupied by the Simpsons. It had been his home and that of his family for some time. The fifth clause gave certain described real estate to named devisees for life with the remainder to named persons. Also, the sixth clause, the subparagraph of that clause, which was as follows:

"The persons whom I have made beneficiaries, as above named, I feel are entitled to the gifts which I have made to them, in return particularly for the kindnesses and courtesies extended to my daughter, Eulalia Salthouse, and to me. Eulalia lost her Mother early in life and was taken into the home of her Grandparents and grew up with her Uncles and Aunt and their children. S. S. Simpson grew up with my daughter and was in our home almost every day, and he and his wife, Rachel Simpson, have been most kind and considerate to Eulalia and me."

The seventh clause provided that all of the rest, residue and remainder of testator's property, both real and personal, wherever situated, should be divided into ten equal shares and should pass to ten persons and groups of persons named in the clause. The two Simpsons and the two Nashes each received one tenth. In the eighth clause testator stated he wished the McPherson and Citizens State Bank of McPherson, Kansas, to act as executor of the will and stated he wished this executor to consult with his trustees he was about to name in connection with any matters in the execution of the will. In the ninth clause he appointed S. S. Simpson, of Kingfisher, Oklahoma, and L. E. Nash, of St. Paul, Minnesota, trustees and provided in case either of them should die or become incapacitated Willis N. Nash was to be the trustee and in case he should die or become incapacitated, Donald E. Norris. This will was executed on May 29, 1935.

On June 22, 1937, testator wrote a codicil in which he made a different disposition of certain of his real estate. He also revoked clause eight, wherein he had designated an executor. He named as co-executors the McPherson and Citizens State Bank, Lula M. Nash and Dr. S. S. Simpson. By the sixth paragraph he revoked the clause in his will which designated the trustees and appointed Simpson, Lula M. Nash and the First National Bank of Wichita trustees. He provided that in case any of them should die or become incapacitated or refuse to act or resign, the District Court of McPherson County should appoint the successor trustees. This clause contained the following sentence:

"My trustees shall be entitled to an equal division of a reasonable fee for their services rendered. . . ."

In the seventh clause he designated Mrs. Jonas Almgren to look after his daughter and directed that she be paid not to exceed $25 a month. He further authorized his trustees that any time during the continuance of his trust estate they pay Lula M. Nash $50 a month for the support and maintenance, if necessary.

The testator died on March 12, 1938. Eulalia was his sole heir. The will was duly admitted to probate on March 18, 1938. The probate court after due notice to all interested parties, including a guardian *ad litem* for Eulalia, approved the petition for final settlement, and found amongst other things that Eulalia was an insane person and decreed that all the real and personal property of the estate was assigned and distributed in accordance with the terms of the will and codicil, the terms of which were recited in the order. The estate was declared settled. The estate was finally closed on April 23, 1943.

On April 12, 1943, an action was begun in the District Court of McPherson County by some of the beneficiaries named in the will against the persons named co-executors, and certain other persons. In this action the plaintiffs prayed the court take jurisdiction of the trust estate created by the will for the purpose of the appointment of trustees, enforcement, administration and management of the trust and that such jurisdiction be retained until the trust was fully and finally terminated, and that the court construe the will in respect to the intention of the testator on various matters alleged and make appropriate orders and judgments thereon and for further equitable relief.

The petition referred to the final settlement.

The facts were set out about as they have been detailed here. Summons was issued to Eulalia and Simpson, the guardian of her person and estate, and on Eulalia, an insane person. Entries of appearance and answers were by Simpson and The McPherson and Citizens State Bank, as co-executors, also by the Simpsons, as individuals. An entry of appearance was also filed by The First National Bank of Wichita. A guardian *ad litem* was appointed for Eulalia, who filed an answer and entry of appearance. All answers were general denials.

The court took jurisdiction of the matter and on the 14th day of July, 1943, found all the allegations in plaintiffs' petition were true; and that judgment should be rendered accordingly; that

Eulalia was an insane person; had been duly served with summons upon her guardian and upon herself and was represented by a guardian *ad litem*; stated the facts about the estate being closed; found that the district court had jurisdiction and authority to appoint trustees, as provided in the will and codicil; that The McPherson and Citizens State Bank would be suitable, The First National Bank of Wichita having been disqualified, and should be appointed a trustee, together with S. S. Simpson and Lula M. Nash. The court made findings as to the will, which are not important here. One paragraph of the judgment provided as follows:

"That the Trustees be and they are hereby excused from complying with any of the provisions of 1941 Supp., 59-1601 to 59-1611, inclusive, or 1941 Supp., 59-2253 to 59-2256."

The trustees duly qualified and on May 12, 1944, the trustees filed their first report and accounting and application for allowance of fees. The first annual report of the trustees was approved May 12, 1944. It allowed to the trustees a fee of $2,050 to be divided as follows:

The McPherson and Citizens State Bank, a corporation. . . . . . . . . . . . . . $150
S. S. Simpson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,750
Lula M. Nash. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Following the making of this report and its approval annual reports were made each year thereafter in substantially the same form until May 1, 1953. They were all approved. On that date the matter of the approval of the tenth annual report of the trustees and the report for an allowance of fees came on to be heard. It should be noted that the prior nine annual reports had been made while Honorable George L. Allison occupied the bench of the McPherson County District Court. At the making of this tenth one the same bench was occupied by Honorable Alfred G. Schroeder, District Judge, who had succeeded Judge Allison. When this report came on to be heard on May 1, 1953, for the year 1952 and that much of 1953, the report was approved and jurisdiction of such matter of the action was retained. Fees for the trustees were fixed in this order as follows:

The McPherson and Citizens State Bank, a corporation. . . . . . . . . . . . . . . $500
S. S. Simpson. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,100
Lula M. Nash. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150
Adams and Jones. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 500

On May 26, 1953, the trial court made an order vacating this order approving the tenth annual accounting, and set it for hearing. In this order the court found that the approval of the accounting should be set aside for the reason it was void and had been irregularly obtained.

At this point the trustee, The McPherson and Citizens State Bank, after consulting with counsel for trustees and the other trustees in general retained Honorable J. R. Rhoades to assist counsel for the trustees in the matter.

In the order setting aside the order of approval the trial court noted that Eulalia had been adjudged incompetent; that Simpson was a trustee and had been appointed guardian for Eulalia on March 28, 1938; that he was also one of the principal beneficiaries of the trust after confirmation of the life interest in Eulalia; that these interests were legally adverse and Simpson was disqualified to represent Eulalia, and a guardian *ad litem* should be appointed to represent her; that by the terms of the will many of the beneficiaries could not be ascertained until the termination of the life interest of Eulalia and a guardian *ad litem* should be appointed. Roger W. Lovett, a member of the bar of McPherson county, was appointed guardian *ad litem* to represent Eulalia and other remaindermen or beneficiaries under the trust and those who were in the service of the United States or its Allies. It was also ordered that the trustees give written notice, together with a copy of the accounting, to all known trustees, beneficiaries and remaindermen; hearing on the tenth annual accounting was set for the 4th of September, 1953; due service was obtained upon all interested parties in accordance with the orders of the court. There was a continuance and on September 8, 1953, the matter came on to be heard. The guardian *ad litem* had filed a general denial on behalf of Eulalia; there were no other pleadings or objections to the approval of the final accounting. At the time of the hearing, counsel pointed this out to the trial court. In response to an inquiry from the trial court the guardian *ad litem* stated he had checked the expenditures and they appeared to be in order. After the examination of trustee Simpson, however, the trial court expressed dissatisfaction with the entire situation and following a colloquy between court and counsel, the guardian *ad litem* and counsel for the trustees were ordered to present evidence at some future

hearing as to the general condition of Eulalia, the institution in which she was then confined, also the condition of the various farms in the estate and how they had been operated and the conduct of the trusteeship generally.

The case again came on for hearing on November 18, 1953. Some uncontroverted facts were brought out at this hearing. The testator, H. L. Salthouse, during his lifetime practiced medicine at McPherson. Part of that time the father of Simpson, the trustee in this case, was his partner. His only child was Eulalia. Her mother had died when she was a little girl. After her mother's death she lived in the family home with her aunt and uncle, who were the parents of trustee Simpson. Eulalia went to Illinois after she was grown, was married and divorced there, and after the divorce came back to McPherson and lived with her father. On November 28, 1934, she was admitted as a voluntary mental patient to The Topeka State Hospital. This was brought about by her father and he chose The Topeka State Hospital because he knew and had a great deal of respect for Dr. Perry, who was Superintendent of the institution at that time. She remained in the institution and on or about September 17, 1937, she was adjudged incompetent in the Probate Court of Shawnee County. Her father was living at that time. He died testate on March 12, 1938. On March 28, 1938, S. S. Simpson was appointed guardian of her person and estate. After Eulalia was taken to Topeka her father closed his house in McPherson and lived at various places around town until on or about July 30, 1937, when he entered into a contract with trustee Simpson and his wife. The Simpsons were at that time living at Kingfisher, Oklahoma, where he had a lucrative dental practice. It was agreed he would give up this practice and they would come to McPherson and make a home for testator in his "present residence" and exercise every effort to see that he had the comforts and conveniences of a home as long as he should live. It was further agreed that in the event Eulalia was ever found by medical authorities to have returned to satisfactory condition, she would also be welcome in the home. The Simpsons also agreed to assist and advise testator in the management of his real property and other business interests of any kind and character, to collect rents and income, pay taxes and do all other things necessary to the proper and efficient management of the business interests of the testator. In return testator agreed to convey to the

Simpsons certain described real estate. This contract was carried out by both parties. Testator was living with the Simpsons in his own home place at the time of his death. On October 24, 1949, as the result of a proceedings instituted by Simpson, it was found that it would be for the best interests of Eulalia that she be paroled from The Topeka State Hospital at Topeka to the Still-Hilldreth Osteopathic Sanitorium at Macon, Missouri; she was taken there and is confined there at this time.

The above is a recital of some of the uncontroverted facts in this record.

When the matter was tried in the lower court it appears there were phases with which the trial judge was not satisfied. There were no opposing parties since the beneficiaries had seen fit to file no pleadings. The burden of the conduct of the hearing in opposition to the trustees and their conduct of the estate was carried on by the trial judge.

Extensive findings were made. In many respects they simply follow what has already been set out here. They pointed out how this particular proceeding was initiated, the death of testator and the terms of his will, including the powers of the trustees, about Eulalia being found to have the disease of Dementia Precox Paranoid Type; that she was 49 years of age on September 17, 1937; that she was paroled to the Still-Hildreth Osteopathic Sanitorium and was there at the time of the findings. Finding No. 13 was as follows:

"It is found that Eulalia Salthouse is properly institutionalized and that the accommodations and conveniences for a patient of her type are adequate and consistent with the means available for her support and maintenance. She receives proper medical care and treatment. The expenditures made on her behalf by the trustees are necessary and reasonable taking into account the income available to her as life beneficiary in the trust estate."

They also pointed out that on March 28, 1938, sixteen days after the death of testator, Simpson was appointed guardian of Eulalia.

The findings stated the contract between the Simpsons and testator and found it had been carried out; that testator knew the condition of Eulalia when he wrote his will and when he made the contract; that the paragraph of the judgment approving the first annual accounting was the following:

"IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Trustees be and they are hereby excused from complying with any of the provisions of 1941 Supp. 59-1601 to 59-1611, inclusive, or 1941 Supp. 59-2253 to 59-2256."

468

The findings further stated that each of the accounts was approved by the trial court, no notice having been given to beneficiaries under the will, no guardian *ad litem* having been appointed for Eulalia, and Simpson having acted as her guardian or trustee was a beneficiary under the will and was living at the time in property owned by the estate; that each of the accountings failed to account for the corpus of the estate apart from the income; that Simpson was the trustee who was actively responsible for the management of the estate.

The trial court next found that Simpson continued to live in the house where he had lived with testator and paid $35 a month rent for it; by going back to the first report in 1938, the trial judge demonstrated to his satisfaction that in December, 1952, Simpson was in arrears in his rent $140 at the rate of $35 a month; that the fair and reasonable rental value of the property was $90 a month and with the offices of the estate moved into it, the fair rental value was $70 a month; that at such rate the costs of upkeep, maintenance, repairs and insurance amounted to more than the rental value; that Simpson had talked with the other trustees, who agreed that $35 per month was fair and reasonable; that there were two vacant lots across the street from the residence which were an expense and brought no income to the estate; that other city properties in McPherson were sold; that the trustees and their attorneys had been paid for their services in the trust estate as follows:

| "Annual Accounting | | Adams & Jones | S. S. Simpson | McPherson & Citizens State Bank | Lula M. Nash |
|---|---|---|---|---|---|
| First | Apr. 1/43-Dec. 31/43 | $750.00 | $1,750.00 | $150.00 | $150.00 |
| Second | Jan. 1/44-Dec. 31/44 | 500.00 | 1,750.00 | 150.00 | 150.00 |
| Third | Jan. 1/45-Dec. 31/45 | 500.00 | 1,750.00 | 150.00 | 150.00 |
| Fourth | Jan. 1/46-Dec. 31/46 | 500.00 | 2,100.00 | 150.00 | 150.00 |
| Fifth | Jan. 1/47-Dec. 31/47 | 500.00 | 2,100.00 | 150.00 | 150.00 |
| Sixth | Jan. 1/48-Dec. 31/48 | 500.00 | 2,100.00 | 300.00 | 150.00 |
| Seventh | Jan. 1/49-Dec. 31/49 | 500.00 | 2,100.00 | 400.00 | 150.00 |
| Eighth | Jan. 1/50-Dec. 31/50 | 500.00 | 2,100.00 | 500.00 | 150.00 |
| Ninth | Jan. 1/51-Dec. 31/51 | 500.00 | 2,100.00 | 500.00 | 150.00" |

The trial court further found that certain sums were paid Simpson for the upkeep of the estate automobile and Lula M. Nash had been paid $50 a month as provided in the will, and in addition was paid $50 as an anniversary gift from estate funds and no order had been taken for such payments; that the estate had continually owned and operated an automobile, which was in the personal

possession of Simpson; and one of these had been bought from Simpson's son-in-law; that the trustees had paid $25 as a donation to the St. Francis Boys Home; that there were as assets in the estate for 1941 a note for $10,000 signed by Simpson's cousin and this note was paid and on November 9, 1946, the trustees borrowed $10,000 to make a loan of $18,000 to Lacy Simpson; that Simpson was a nephew of testator; Margaret Frakes, Simpson's daughter; Eulalia, his cousin; Charles Jones, counsel for trustees, was a nephew of testator, and he drew the contract and the codicil. Finding No. 34 was as follows:

"The order of Final Settlement in the Probate Court of McPherson County, Kansas, dated April 23, 1943, after the estate had been administered from the 18th day of March, 1938, recites the disposition of the property under the residuary clause of the Last Will and Testament and codicil thereto of H. L. Salthouse, deceased, and after listing some specific assets continues as follows: 'Any and all other property *owned by H. L. Salthouse at the time of his death,* whether above described or not, wherever the same may be located.' (Emphasis supplied.) The Order thus serves notice on the trustees to account for the corpus of the property in the estate of H. L. Salthouse, deceased, in accordance with the terms of the testamentary trust, separate and apart from the income, all of which 'shall be used for the care, support and maintenance' of Eulalia Salthouse for and during the term of her natural life."

The trial court further found that at various dates money was expended by the trustees for lawnmowers, repairs for same and for awnings for the house; that in 1948 and 1949 and on February 2, 1952, in the aggregate of $1,178.41 was paid to the collector of internal revenue; that $10 a month was paid as office rent for Simpson to The McPherson and Citizens State Bank, another trustee. Finding No. 39 was as follows:

"Charles Jones, attorney for the trustees, requested fees of $500.00 for services 'a little in excess of six days' to the estate for the year 1952 up to and including May 1, 1953, the date upon which the accounting was filed and presented initially to this Court. For services after said date in complying with the orders of this Court for further hearing, he requests additional fees of $1750.00 for 130 hours expended in legal services to the trust estate for a total request of $2250.00. The trustees also request additional fees for services to the estate in complying with the orders of this Court for further hearing on the Tenth Annual Accounting."

Finding No. 40 was as follows:

"The notice for hearing on the Tenth Annual Accounting was limited to the Tenth Annual Accounting and application for fees, made on the 1st day of May, 1953. It is found that the parties are before the Court on the Tenth Annual Accounting only by reason of said notice and the prayer in the trustees

application for approval, which is likewise limited, even though the application itself incorporates all prior accountings by reference."

Conclusions of law were entered following these findings. The judgment followed these conclusions. The trustees filed a motion for a new trial on eight grounds. At the hearing of this motion oral testimony was taken. On April 2, 1954, a modified journal entry was filed. This is the judgment from which the appeal was taken.

In the first paragraph of this journal entry the court decreed that the contract between the Simpsons and testator terminated upon the date of testator's death; that under the terms of the will and codicil Eulalia was entitled to have the income from the estate and by reason thereof the trustees were required to account for the income from the estate separate and apart from the corpus of the trust property; that the trustees had by incorporating all nine annual accountings in their tenth annual report placed all of them before the court for review; that the trustees had no authority to pay the $50 anniversary gift to Lula M. Nash nor the $25 gift to the Boys' School; that the order of the trial court in approving the first report and excusing the trustees from complying with the 1941 Supp., 59-1601 to 59-1611, inclusive, and 1941 Supp., 59-2253 to 59-2256, was void as against public policy; that the personal benefits to Simpson while living in the house in question for $35 a month were considered by the trustees to be additional compensation and the trustees were not permitted to pay themselves a fee or take personal benefits without court approval nor purchase cars for the estate without prior court approval and the trustees should be surcharged the difference for the year 1952, or $360; that the court had no authority to order the sale of the two vacant lots; the court allowed the trustees $2,350 for the year 1952 and ordered the trustees to divide it amongst themselves; that the expenditures of the trustees for automobile maintenance for 1952 were approved; held that listed items for the purchase of lawn-mowers and their repair and shutters for the house were not approved but no surcharge was made because these had been taken into consideration in fixing the rent; that the expenditure of $1,178.41 was held in abeyance to enable the trustees to present evidence for equitable relief; disapproved the dealings with relatives already referred to. Conclusion No. 13 was as follows:

"That no man can serve two masters and that the position of S. S. Simpson,

as trustee in this testamentary trust and also as guardian for the insane life beneficiary by reason of independent appointment in the Probate Court of McPherson County, Kansas, are legally adverse and he must resign from one position or face removal."

Conclusion No. 14 was that the trustees must sell the estate automobile and thereafter a reasonable fee for each mile necessarily and actually traveled by the trustees for the estate by privately owned conveyance would be allowed. Conclusion No. 15 was that all other expenditures made by the trustees and items of income were found to be correct. Conclusion No. 16 allowed Adams, Jones, Robinson and Manka $1,200 for services during 1952 and all services in connection with the hearing on the tenth annual report; no fee was allowed J. R. Rhoades; the guardian *ad litem* was allowed a fee of $750 and $559.92 for expenses, including $359.92 to a doctor who testified. Conclusion No. 17 was as follows:

"That the trustees are hereby directed to file an account which will incorporate all of the ten annual accountings heretofore filed in this court, setting forth the principal or corpus of the trust property separate and apart from the income; that notice shall be given to all parties as heretofore given on the Tenth Annual Accounting for hearing on said account and that a guardian ad litem and attorney under the Soldiers' and Sailors' Civil Relief Act, as amended, be appointed, and that in addition to the foregoing notice, a copy of the accounting herein directed, together with a copy of the findings and conclusions herein, shall be sent to all known beneficiaries."

The trustees filed a motion for a new trial on eight grounds. This was overruled. Hence this appeal.

The specification of errors was that the trial court erred in making the findings and conclusions of February 19, 1954; in refusing to approve the tenth annual accounting; in attempting in the findings, conclusions and judgments to usurp the powers and duties of the trustees and to create a controversy between the trustees and beneficiaries where none existed; in failing to delete from its order of May 26, 1953, any reference therein that the court's order of May 1, 1953, was in any wise void and irregularly obtained; in refusing to allow the trustees and their attorneys reasonable fees for 1952 and in connection with the hearings on the tenth annual accounting; in entering judgment according to the journal entry of April 2, 1954; in holding in paragraph 2 of that judgment that Eulalia was entitled to all the income from the trust estate as her absolute property and

that the trustees were required to account separately for the income and the corpus; in holding under paragraph 3 that the prior nine annual accountings were open for review in throwing light upon the tenth annual accounting; in holding under paragraph 4 that the trustees had no authority to pay $50 as a 50th wedding anniversary gift to Lula M. Nash and on January 16, 1950, to pay $25 to the St. Francis Boys Home as a donation; in holding under paragraph 5 that G. S. 1941 Supp., 59-1601 to 59-1611, inclusive, or 1941 Supp., 59-2253 to 59-2256, inclusive, were applicable to this trust and the order of the court on July 14, 1943, was void as against public policy; in holding under paragraph 6 that the trustee Simpson derived improper benefits from occupying the house in question and should be surcharged in the amount of $360; in holding under paragraph 7 that the trustees did not act in good conscience in not having sold the vacant lots; in holding under paragraph 8 that the court had no authority to divide trustees' fees among separate trustees and that the sum of $2,350 was a reasonable fee for the trustees for services during the year 1952; in holding under paragraph 9 that expenses for automobile maintenance and operation and expense of S. S. Simpson for the trust estate were not authorized in advance of court approval; in holding under paragraph 10 that certain expenses therein referred to were not approved as proper items for expense and in using such expenses as a consideration in determination of the fair rental value of the property in question; in holding that the positions of Simpson as trustee and guardian for the insane life beneficiary, Eulalia, were legally adverse and he must resign from one position or face removal; in disapproving the operation of an automobile owned by the estate at estate expense and directing that the trustees sell such automobile at the best available price and thereafter receive a reasonable fee for the mileage traveled in looking after the affairs of the estate; in holding that $1,200 was a sufficient and reasonable fee for the trustees' attorneys for services during 1952 in connection with hearings and trial on the tenth annual accounting and refusing to allow the trustees a reasonable fee for such attorneys; in refusing to recognize J. R. Rhoades of the firm of Johnson, Rhoades & Lehmberg as attorney for the trustees and in refusing to correct the record on motions and in refusing to allow

a reasonable fee to the trustees for him as such attorney; in allowing a guardian *ad litem's* fee of $725 and expenses in the sum of $539.92; in holding that the trustees must file a new account incorporating all the previous ten accountings setting forth the principal and corpus separately; and holding that notice be given to all the parties as given on the tenth annual accounting and that a guardian *ad litem* and attorney be appointed; in holding in effect that all previous accountings of the district court were null and void; and in overruling the motions for a new trial filed on February 23, 1954 and on April 5, 1954.

The trustees call our attention at the outset to the fact that this matter was tried by the trial court. They argue the provisions of G. S. 1949, 60-3004 govern. That section provides, in part, as follows:

"In cases tried by the court or a referee the judgment may be modified in accordance with the facts disclosed by all the competent evidence or a new trial ordered as to one or more issues and refused as to the others, as justice may require."

We shall consider the appeal with that section in mind. Actually there was very little dispute in the evidence. In the main what dispute there was arose from the constructions put on documents, and interpretations given the will and various court orders.

The trustees argue first the trial court should have approved the tenth annual accounting after the hearing of November 18, 1953, since notice had been given all interested parties, no objections or answer having been filed, and all expenditures having been verified and supported by testimony of witnesses. The general rule is stated in *Bogert on Trusts and Trustees*, Vol. 4, Part 2, Sec. 971, as follows:

"The burden is on the accounting trustee to prove to the satisfaction of the court the merit of all claims for credit which he makes. If he makes out a prima facie case for credit, an objecting beneficiary will have the burden of introducing evidence and overcoming this case. It will then be a question of fact for the court as to whether the trustee has sustained his claim by the preponderance of the evidence."

Trustees are presumed to have acted in good faith. (See *Prager v. Hart,* 106 Kan. 14, 186 Pac. 1015; also *Clark v. Clark,* 123 Kan. 646, 256 Pac. 1012, and *Elward v. Elward,* 117 Kan. 458, 232 Pac. 240.) The trustees made a *prima facie* case here. There was no dispute whatever except as the trial judge attempted to establish

by cross-examination of the trustees' witnesses. The trial judge saw fit to make some forty findings of fact and seventeen conclusions of law, however. A trial court does have power and authority to meticulously investigate the management and control of a trust such as this. This is not to say the court's findings and conclusions are not open to review, however. We shall examine these findings and conclusions.

We shall consider the argument on the various questions as they are presented by the trustees.

The first is, the trial court erred in holding the order of May 1, 1953, and similar orders of the court approving accountings for the nine preceding years were void and irregularly obtained. In the first place, it is difficult to understand why the trial court included such a finding in its order of May 26, 1953. The court had power to set aside its order of May 1 approving the tenth annual accounting without giving any reason since the order was made during the term. The reason given in the order, however, that the order was void because no guardian *ad litem* was appointed for Eulalia when it was approved would render each of the nine preceding accountings void. These were interlocutory hearings. Under such circumstances, the question of whether a guardian *ad litem* should be appointed for Eulalia was in the discretion of the trial court. Such a guardian was appointed when the first accounting was made. The next eight accountings were made and approved by the same trial judge The legislature has not seen fit to require the appointment of a guardian *ad litem* in such matters. The order approving these accountings was not binding on the beneficiaries as *res adjudicata*. When the final accounting is made, all interested parties will be afforded an opportunity to investigate the interlocutory accountings for fraud, bad faith or misapplication of funds. (See *In re Trusteeship of Lawson*, 215 Iowa 752, 244 N. W. 739, 88 A. L. R. 316; 19 Am. Jur., Equity, Sec. 406.) The trial court erred in this holding.

The trustees next argue the trial court erred in concluding that the trial court's order approving the first accounting, that the trustees were excused from complying with G. S. 1941 Supp., 59-1601 to 59-1611, and G. S. 1941 Supp., 59-2253 to 59-2256, was void as against public policy. This in the present matter appears to be a gratuitous criticism of the trial judge who approved the first accounting. These sections relate to trusteeships in the probate

courts. They have no relationship to a trusteeship such as this in the district court.

The trustees next argue the trial court erred in conclusion No. 4, where it was held the trustees had no authority to pay $50, March 23, 1948, to Lula M. Nash as a 50th wedding anniversary gift and to pay $25 to St. Francis Boys Home. In the first place this had no place in the court's conclusions. The trial judge himself in the conclusion stated no surcharge was made because the jurisdiction of the court was limited to the tenth annual accounting. Since the court held it could grant no relief on account of this conclusion it had no place in the record. In the second place, this will contained some broad and generous provisions as to the power of the trustees. Amongst these provisions was the following:

". . . it being my desire that my said trustees in making expenditures for my said daughter shall in every way do all that is possible to see that she is comfortable and well cared for and that she shall have sufficient money to make all reasonable contributions to any church or benevolences as she may desire, or to her relatives as she may desire."

There was uncontradicted evidence in this record that the Simpsons called on Eulalia at the sanitarium from time to time and on one occasion she in a lucid moment reminded them that Mrs. Nash's 50th wedding anniversary would occur soon and requested him to give Mrs. Nash $50 for a gift. Such a gift was clearly within the terms of the above quoted provision. The Boys School is a benevolence as contemplated by the above provision. The gifts were set out in one of the previous reports and approved by the trial court along with the rest of the report. Neither the guardian *ad litem* nor the trial court argue there was any fraud or bad faith on the part of the trustees. There was no evidence of such. The trial court erred in this conclusion.

This brings us to a consideration of conclusion No. 6 in the journal entry. This has to do with the occupancy of the house in McPherson that had been the residence of the testator for years and in which he and the Simpsons were living at the time of his death. The trial court and the guardian *ad litem* made a point of the fact that Simpson had been paying only $35 a month rent for this house There was evidence that a reasonable rent for the property would be $90 a month. The trial court held that this was actually additional compensation for trustee Simpson and as such could not be approved. The trial court further held that the

trustees should be surcharged the sum of $55 a month for the year 1952 or $660, also for four months' rent in arrears or $360. This point may not be answered by the holding that this constituted an unauthorized fee paid to Simpson. All the surrounding facts and circumstances must be considered. The will conferred broad powers on the trustees. At one point the will provides:

"It being my desire that my trustees shall have the same power and control of my said estate, both real and personal, (except that they shall not have the power to sell real estate which I have specifically devised) as I myself would have should I be living."

A broader conferral of powers could hardly be drawn. This house was the one in which the Simpsons and testator were living when testator died. The Nashes were given a life estate in it by the will on the death of Eulalia. Hence the trustees could not sell it. The same clause in the will that gave Mr. and Mrs. Nash the life estate in the house gave them a life estate in the household goods then in the home as well as automobile or automobiles, if any. This undoubtedly meant the household goods in it when Eulalia died. This required the household goods in the house when testator died should be left there until Eulalia died. That is the way the trustees have interpreted it. The testator's household goods are still in the house as well as Eulalia's clothing. In the contract between the Simpsons and testator it provided that if Eulalia should recover she would be welcome in this home. The trustees considered all these facts and circumstances, saw they would be compelled to hire a caretaker or rent the house to a stranger. They had power and authority to decide which of these alternatives would be wisest and to the best advantage of the estate. There was no evidence whatever of bad faith or fraud. As to the four months' rent the trial court held Simpson was in arrears, we have examined and considered the cross-examination of Simpson by the trial judge in which he went back to the first accounting. We have also examined and considered the testimony of Simpson. There is no substantial evidence to support the findings of fact of the trial court upon which this conclusion was based. The court erred in this conclusion.

We shall next discuss that part of conclusion No. 6 that the trustees had no authority to purchase automobiles, together with conclusion No. 14 in which the trial court ordered the trustees to sell the estate automobile and holding that thereafter a reasonable

fee for each mile necessarily and actually traveled by the trustees in behalf of the estate would be allowed. We have several times referred to the broad powers conferred on the trustees by the will. The trial court in this conclusion showed a misunderstanding of the relative powers of the trustees and the trial court. Whether it was to the best advantage of the estate to operate an estate automobile or to pay mileage for a privately owned automobile was a matter within the discretion of the trustees. (See *In Re Estate of Rutherford,* 154 Kan. 361, 118 P. 2d 553.) The trial court erred in this conclusion.

We shall next consider the trial court's conclusion No. 7. In this conclusion the trial court held that the trustees in good conscience would have sold the vacant lots across the street from the residence, but for the fact that Simpson derived profit from them. It is difficult to understand why the trial judge made this conclusion since he states he had no control over the sale of real estate by the trustees. It amounts to a gratuitous criticism of Simpson. Trustees are presumed to act in good faith. In fact, Simpson testified the trustees had an opportunity to sell these lots for a filling station but did not care to make such a sale. There was no evidence in this record to warrant this conclusion of the trial court.

We shall next consider the trial court's conclusion No. 8. In this conclusion the trial court held a reasonable fee to the trustees to be $2,350 for their services during 1952 in the regular management of the estate and also for services in connection with hearings on the tenth annual accounting. The court directed this fee to be subject to an equal division of the trustees. It is difficult to follow the trial court in this conclusion. It was $400 less than was allowed by this same trial judge on May 1 in approving the tenth annual accounting. In the meantime as a result of the trial court's insistence on further evidence the trustees were forced to travel to Illinois, Oklahoma, Missouri and various places in Kansas. There were hearings on depositions and attendance at court. Simpson has consistently been paid $2,100 a year for his work with the estate. There was evidence that such work took one-half his time. He has acted as guardian for Eulalia, for which he was paid nothing. Mrs. Simpson helped him with the work and received nothing. The estate has been well managed as witness the fact its appraisal value at the time of final settlement in probate court was $161,754.87, while at the time of the tenth annual accounting it was $426,415.75.

A fee of $4,000 for the trustees would be fair and reasonable under all the facts and circumstances.

The trial court relied on a provision in the codicil:

"My trustees shall be entitled to an equal division of a reasonable fee for their services rendered in connection with the administration of my trust estate."

to substantiate the order that the fee allowed the trustees should be subject to an equal division by the trustees. All the provisions of the will and codicil must be considered together. Another clause of the will is as follows:

"My trustees may decide in their discretion between themselves as to which portion of my real estate they may individually control and manage, and they may each and individually, after such decision, have the same power and control over that portion which each may decide to manage and control, to the same extent as if all of my said trustees were exercising the management and control thereof, it being my desire that this provision will facilitate the management of said real estate which is located in several different states of the Union."

Pursuant to this, the management of the estate was turned over to Simpson. The bank and Mrs. Nash acted in a merely advisory capacity. We realize, however, that the trustees themselves knew how much extra work and trouble was caused each of them by these hearings. On that account we order a lump fee of $4,000 to all the trustees, with the direction that they make an equitable division amongst themselves. The conclusion of the trial court fixing a fee of $2,350 for all the trustees is reversed.

We go now to conclusion No. 10. In that the trial court withheld approval of certain items expended for the upkeep of the house and lot in question. The court erred in conclusion No. 10. What we said in discussing conclusion No. 6 applies with equal force to this.

In conclusion No. 11 the court withheld approval of an expenditure of $1,178.41 on May 14, 1952, to the federal collector of internal revenue. This expenditure was explained by trustee Simpson. For years the trustees had paid federal income taxes on the income of the estate as one item. The bureau of internal revenue insisted from time to time that taxes should be paid and that there also should be a report made for Eulalia and taxes paid on her income. The matter had not been pressed by the bureau for several years. In 1952 it was pressed. At that time several items in the aggregate amounting to $1,117.41 were demanded by the collector and paid by the trustees. This was a perfectly natural dispute in which any

business might find itself engaged. Under the terms of the will creating the trust all such problems were for the exercise of the judgment of the trustees. They exercised their judgment and made the payment. There is no question of bad faith. The court erred in refusing approval of it.

In conclusion No. 13 the court held the positions of Simpson as guardian of Eulalia and as trustee of the estate were legally adverse. The court ordered he must resign from one or the other or face removal. But little would be added to this opinion by restating all the surrounding facts and circumstances heretofore set out in this already too lengthy opinion. Considering all of them, these two positions are not legally adverse. This record discloses that Eulalia is entirely without property other than the maintenance and support she receives under the terms of the will. Actually Simpson acts as guardian of her person only. He receives no compensation for that. There is no reason why he should not be one of the trustees for the estate and guardian for Eulalia. The court erred in this conclusion.

In conclusion No. 16 the court allowed $1,200 for the firm of Adams, Jones, Robinson and Manka, of Wichita, for services during 1952 and in connection with the hearings on the tenth annual accounting during 1953. No fee was allowed to J. R. Rhoades who appeared on behalf of the McPherson and Citizens State Bank, a trustee; the guardian *ad litem* was allowed a fee of $725 and expenses in the sum of $539.92, which included a fee of $359.92 for a psychiatrist who visited Eulalia at the direction of the trial judge. We have heretofore detailed the work performed by these attorneys. The court should have considered their services performed by them in these extended hearings. The court should have held that J. R. Rhoades was attorney for the McPherson and Citizens State Bank, as trustee. It asserted Mr. Jones, who has acted as attorney for the trustees throughout the life of the trust should not have been treated by the trial court as attorney for the bank as an individual. Rhoades was called into the case later and as a result of the trial court's order of May 26, 1953, wherein it was held wrongfully that the order of May 1, 1953, was void and had been irregularly obtained.

As to the amounts allowed, we have examined the testimony of the lawyers as to the extensive work entailed on account of these extraordinary hearings. They were required to make trips to

Oklahoma, Illinois and various places in Kansas and to do a great deal of research work and to conduct investigations generally. A fair and reasonable fee for the firm of Adams, Jones, Robinson & Manka is $2,500 with expenses of $114.17 in addition; for J. R. Rhoades $1,000 with $80.30 expenses in addition. We find no fault with the fee that was allowed the guardian *ad litem*.

The trial court erred in the 16th conclusion.

In the 17th conclusion the trial court ordered the trustees to file an accounting which would incorporate all of the ten annual accountings, setting forth the principal or corpus of the trust property apart from the income. The court also directed that notice be given to all interested parties as has been heretofore detailed was given on order of the trial court, of the tenth annual accounting, and that a guardian *ad litem* under the Soldiers' and Sailors' Relief Act be appointed and a copy of the account and conclusions thereon should be sent to all known beneficiaries under the will.

It is a little difficult to understand the court's theory in making this order. In at least two of the earlier conclusions the trial judge stated he had no jurisdiction over anything other than the tenth annual accounting. However, we surmise the trial court proceeded to interpret the will and based this conclusion of law on the theory that under its terms Eulalia was entitled to be paid all of the income from the trust estate and all of the income not spent for her support and maintenance should be set up in a separate fund and carried as her separate estate and administration had on it at the time of her death.

This was a hearing on the tenth annual accounting of the trustees. No pleadings were filed, no issues joined nor were all the parties in court who might be interested in a final adjudication of this question. An adjudication of such a question had no place in these proceedings. We refrain from an interpretation of the will as to parties not in court. The testator attempted to say to whom his estate should go at the death of Eulalia. If the income from the estate other than is necessary to maintain Eulalia and pay the costs of administration should go to Eulalia's estate and at her death intestate go to her heirs at law, it would pass somewhat differently than the testator intended by his will. These proceedings are not the proper vehicle to determine such a question either in favor of or against her heirs at law, not named in her father's will.

In so much of conclusion No. 17 as directed the trustees to file

an accounting which would incorporate all of the ten annual accountings setting forth the corpus of the estate separate from the income, the trial court erred. In that portion of the conclusion in which the trial court ordered notice to be given to all interested parties as finally given on the hearing of the tenth annual accounting and that a guardian *ad litem* and attorney under the Soldiers' and Sailors' Relief Act be appointed and a copy of the accounting, together with a copy of the findings, and conclusions be sent to all known beneficiaries the court did not err.

Except for that part of conclusion No. 17, to which reference has just been made, the judgment of the trial court is reversed, with directions to proceed to approve the tenth annual accounting, in accordance with the views expressed in this opinion.

Robb, J., not participating.